UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:09-cv-107-KSF

JAMES H. LIMBRIGHT, et al.                                                                   PLAINTIFFS

vs.                                          **OPINION AND ORDER**

GEORGE HOFMEISTER, et al.                                                              DEFENDANTS

This matter is before the Court on the motion of Judgment Plaintiffs, James H. Limbright ("James") and Henry J. Limbright ("Henry"), for summary judgment [DE 180] and the cross motion of Defendants for summary judgment and for judgment on the pleadings [DE 181]. For the reasons set forth below, Plaintiffs' motion will be granted in part and denied in part, and Defendants' motion will be granted in part and denied in part.

**I.    BACKGROUND**

In 2000, Innovative Coating Technologies, Inc. ("ICT") purchased from James and Henry Limbright 100 percent of the stock in Performance Plastics, Inc., a Michigan corporation. ICT's promissary notes for the purchase were personally guaranteed by George and Kay Hofmeister,[1] Kentucky residents. After ICT filed for bankruptcy, Plaintiffs brought an action in this Court on March 6, 2001 to recover on the Hofmeisters' guarantees of the purchase price. On March 29, 2002, Plaintiffs' summary judgment motion was granted and judgment entered against the Hofmeisters for $1,200,000. ("Limbright I" or "Kentucky Judgment").

On June 28, 2004, the Limbrights registered the judgment in Michigan and initiated supplementary proceedings against the trustee of family trusts George Hofmeister established for each of his three children (Hofmeister Family Trusts" or "HFT"). On January 9, 2007, the parties

---

[1] George and Kay Hofmeister are referenced herein by their first names or simply as "the Hofmeisters." References to Megan, Scott and Jamie Hofmeister will be to "the Children."

entered into a settlement agreement whereby HFT was to pay the Limbrights $950,000. *Limbright v. Hofmeister*, 553 F. Supp.2d 886, 887 (E.D. Mich. 2008) ("Limbright II"). When HFT defaulted, the court entered judgment in the amount of $1,000,000 against the trustee of the HFT pursuant to the settlement agreement. ("Michigan Judgment").

On May 30, 2008, Plaintiffs filed a Complaint in Supplementary Proceedings in the United States District Court, Eastern District of Michigan adding the three Hofmeister children and the "John Doe" trustees of trusts created by the Children ("Children's Trusts" or "CT"). On June 30, 2008, Defendants filed motions pursuant to Fed. R. Civ. P. 12(b)(2), 12(b)(3), 12(b)(6) and 12(e) to dismiss. [DE 12]. The Michigan court granted the motion to dismiss defendants Megan G. Hofmeister, Scott R. Hofmeister, and Jamie S. Hofmeister (the "Children") for lack of personal jurisdiction and transferred the balance of the case to this Court. All other motions to dismiss were denied. [DE 27]. The Michigan court later clarified that it did not intend to rule on the adequacy of the Plaintiffs' allegations of fraud in the complaint and deferred to this Court on that issue. [DE 80, p. 9, n. 7].

On March 4, 2010, Plaintiffs filed their Second Amended Complaint naming the Children in this Court. [DE 50]. It is undisputed that the allegations in the Amended Complaint are identical to those in the original Complaint. [DE 1, 50]. Additionally, the Limbrights registered their Michigan Judgment in this Court on June 7, 2010. [Case No. 5:10-fj-2-JBC].

Counts I and II of the Second Amended Complaint are proceedings supplementary to the Michigan and Kentucky judgments. Counts III and IV allege fraudulent conveyances. Counts V-VII are alter ego claims, and Count VIII requests appointment of a receiver for the assets and interests of HFT and CT. The Limbrights seeks summary judgment on all counts, including an argument that they are able to collect from the Defendants not only the amount of the Michigan Judgment, but also the amount of the Kentucky Judgment. The Defendants filed a cross motion for summary judgment on all counts.

**II.   ANALYSIS**

    **A.   Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In other words, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment. *Id.* at 343. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson,* 477 U.S. at 252. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

    **B.   Alter Ego Claims**

In support of their motion for summary judgment, Plaintiffs argue that George and Kay Hofmeister (George and Kay) are alter egos of the Childrens' Trusts (CTs); that the CTs are alter

egos of the Hofmeister Family Trust (HFT); and that George and Kay are alter egos of the HFT. [DE 180, pp. 19-25; DE191, pp. 6-9].  The Defendants first argue in response that Michigan Supplementary Proceedings may not be used for alter ego claims. [DE 189, pp. 14-16.] This argument is not well taken, since Plaintiffs did not plead their alter ego claims under Michigan's Proceedings Supplementary to Judgment statute, M.C.L. § 600.6104.  Only Counts I and II of the Second Amended Complaint are pled as proceedings supplementary to judgment. [DE 157].  The alter ego claims (Counts V, VI, and VII) are separate and distinct claims.  *Id.*  Additionally, *Green v. Ziegelman,* 282 Mich. App. 292, 767 N.W.2d 660 (2009), on which Defendants rely, is distinguishable in that the person on whom liability was improperly imposed in that case was not a party to the proceedings.

"Alter ego means 'other self' – where one person or entity acts like, or, for another to the extent that they may be considered identical." *Sumpter v. United States*, 302 F. Supp. 2d 707, 720 (E.D. Mich. 2004).  Michigan courts utilize cases involving corporate entities for analyzing the alter ego theory in the context of a trust.  *Comer Family Equity Trust v. United States*, 732 F. Supp. 755 (E.D. Mich. 1990).  *Comer* involved a couple who placed virtually all of their assets in family trusts. The Internal Revenue Service levied against the trust property to satisfy a tax lien.  The court used "piercing the corporate veil" analysis for guidance and found that the sole function of the trusts was to manipulate the Comers' income and assets.  *Id.* at 760.   The factors the trial court considered were:

> (1) the treatment by the taxpayers of the plaintiff's [trust's] assets as their own; (2) the control of the plaintiff by the taxpayers and their family alone; (3) the use of plaintiff's funds to pay the taxpayers' personal expenses; (4) transference of property from the taxpayers to the plaintiff for little or no consideration; and (5) the fact that the plaintiff fully supported the taxpayers in the style of their choosing.

*Id.* at 759. Other factors that may be considered for guidance include: "undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate

4

formalities, and whether the corporation is merely a sham." *Id., quoting Laborers' Pension Fund v. Weinberger Homes, Inc.*, 872 F.2d 702, 704-05 (6th Cir. 1988). It noted that these "factors are not, however, all-inclusive and 'the entire spectrum of relevant fact forms the background for such an inquiry....'" *Comer*, 732 F. Supp. at 759. In concluding that the trust was merely the alter ego of the taxpayers, the court noted that the Comers "transferred essentially all of their real and personal property, as well as all of Mr. Comer's future earnings, to the Family Trust in exchange for paltry consideration." Thereafter, the Comers were basically insolvent. The Family Trust purchased a residence for the Comers where they continued to live, and Mr. Comer signed trust documents when he had no authority to do so. *Id.* at 760. *See also Livernois Trust v. Commissioner of Internal Revenue,* 433 F.2d 879, 882 (6th Cir. 1970) ("[T]he problem here is one of self-dealing between the Trustees of a trust and five corporations, which those same Trustees controlled"); *Bodenhamer Building Corp. v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir. 1989) (subsidiaries were mere instrumentalities of parent that avoided creditors by "fraudulent shell game.").

    1.  <u>George and Kay Hofmeister Are Alter Egos of the CTs</u>[2]

In support of their claim that George and Kay Hofmeister are alter egos of the CTs, Plaintiffs note that George Hofmeister arranged several loans, including personal loans, that were guaranteed with the assets of the CTs. On April 27, 2007, Crestmark Bank made a term loan of $2,650,000 to George Hofmeister. [DE 180-18]. The CTs guaranteed the loan. *Id.* On December 29, 2008, Crestmark Bank loaned George Hofmeister $700,000, which was guaranteed by the CTs. [DE 180-30]. On November 17, 2009, Crestmark loaned George Hofmeister $500,000, which was guaranteed by the CTs. [DE 180-32].

---

[2] George testified that the HFT Trustee was talking with the children about a distribution, and George suggested to the Children that they create their own trusts, which he had an attorney prepare for them in 2004. [DE 189-3, p. 19]. George was named as trustee because he is their father and they trust him. *Id.* at 20.

5

George Hofmeister and Douglas Holmes, Trustee of the HFT, testified that George's 51 percent ownership in AHD, a company in which George is the Chairman and makes all day-to-day decisions, was transferred to the HFT in 2002 and then distributed to the Children on December 31, 2006. [DE 180-12 at ¶¶ 7-8; 189-3, pp. 70, 90-92]. Also distributed from HFT to the Children in 2006 was 100 percent interest in American Metals Industries, Inc. ("AMI"), which wholly owned MW Universal. [DE 189-7; 180-6, pp. 63-4; 180-12; 180-13]. After the distribution from HFT, the Children transferred the companies to the CTs. [DE 180-12; 189-3, p. 72].

JSM Enterprises LLC, named from the first initials of the Children, was created in the CTs and became a holding company for cash generated within the CTs. [DE 180-22, pp. 20-21]. During 2007-2010, George Hofmeister repeatedly directed AHD, the company George managed which had been distributed to the Children and was now in the CTs, to make deposits into the bank accounts for JSM and AMI. [DE 180-22, p. 24; DE 180-6, pp. 147-48]. From those bank accounts, George and Kay Hofmeister paid all of their personal living expenses. [DE 180-21, 180-24, 180-25, 180-26]. Illustrative of the very personal nature of the expenses paid are two checks (Nos. 1403 and 2005) to the First Presbyterian Church. [DE 180-21]. Kay also paid for her trips to Florida, China and Iceland out of those accounts. [DE 180-23, pp. 46-48]. JSM received about $500,000 annually labeled as "management fee" from AHD, but no management was provided, nor any other consideration. [DE 180-22, pp. 22-23; DE180-24]. Documents produced by AHD showed a total of $1,655,000 transferred from AHD to JSM through February 15, 2011. [DE 180-22, p. 23]. Subsequently, AHD began making transfers to AMI Morton at George Hofmeister's direction. [DE 180-22, p. 24]. The funds from JSM and AMI were used for personal living expenses and other family expenses. [DE 180-22, pp. 41-42]. Without question, the Hofmeisters were using assets of the CTs as their own personal assets.

Additionally, George talked with the Controllers of the companies in the CTs to determine who had funds available in early 2007. He then arranged for a payment of $300,000 from the CTs

to the Limbrights as part of the obligation of HFT to the Limbrights in settlement of the Kentucky Judgment against George and Kay. [DE 188-10, pp. 163-166]. George told Kay and the children he was going to make that payment from the CTs because "it was in the family's best interest to do it." [DE 188-10, p. 166]. Accordingly, the Hofmeisters used the CTs' assets to pay for a judgment against them personally.

### 2. The CTs Are the Alter Egos of HFT

George Hofmeister, as trustee of the CTs, used the CTs' assets to buy out the interests of creditors who held millions of dollars of claims against the Hofmeisters personally and the HFT. On June 12, 2009, the CTs paid $3,500,000 to purchase from JPMorgan Chase Bank, N.A. Chase's interests in: (1) a Final Judgment dated April 5, 2005 against George and Kay Hofmeister, Highland Farms, LLC and Highland Stud International, LLC; (2) a promissory note dated February 15, 2001 in the amount of $30,000,000; (3) a mortgage dated September 1, 2001 by George and Kay; (4) a mortgage dated September 1, 2001 by Highland Farms; and (5) guarantee agreements by the Highland entities. [DE 180-31]. The only consideration provided to the CTs for purchasing these debts of the HFT and the Hofmeisters is in the form of an assignment of the bank's judgment, judgment lien, and mortgages. *Id.*

On January 25, 2010, George Hofmeister, as trustee of the CTs, used $4,500,000 from the CTs' assets to purchase from Airlie Opportunity Capital Management various obligations and liens, including but not limited to, a loan agreement dated April 24, 2004 between AMI and the HFT in the amount of $4,000,000; a loan agreement dated July 20, 2004 among Lester PDC, LLC, AMI, Airlie and HFT in the amount of $3,000,000; a note dated December 22, 2000 from George and Kay to the HFT for $1,450,000; a December 22, 2000 mortgage from George and Kay to HFT; a $3,560,000 note from Highland Farms to BB&T; and an August 18, 2004 mortgage from HFT to Airlie for $3,000,000. [DE 180-33]. Once again, the only consideration provided to the CTs for its purchase of these debts of the HFT and the Hofmeisters was in the form of an assignment of

7

obligations and liens. George Hofmeister is using CTs' assets to buy his personal obligations and those of the companies he manages and controls. The CTs became the largest creditors of the Hofmeisters and the HFT. As trustee of the CTs, George Hofmeister could control the enforcement of that debt to the detriment of other creditors.

### 3. George and Kay Hofmeister Are the Alter Egos of HFT

George and Kay executed a settlement agreement with the Limbrights on January 7, 2007 whereby the HFT would pay $950,000 for the Kentucky Judgment against the Hofmeisters. [DE 180-4]. However, George testified that HFT had no income after the distribution of its companies, AHD and AWI, to the children on December 31, 2006. [DE 188-10, p. 153; DE 180-13]. He testified that from December 31, 2006 to the present, the HFT never had sufficient funds to pay the Limbrights. [DE 180-6, p. 176]. Nonetheless, George was using the HFT to cover his and Kay's personal obligation. There is no evidence of any consideration to the HFT in exchange for assuming this obligation.

Douglas Holmes was Trustee of the HFT until March 2, 2007. [DE 180-10, p. 257]. George was the settlor of the HFT and, therefore, could not control disposition of its assets as trustee. 28 U.S.C. § 674. Nonetheless, George arranged for Holmes to give George a Limited Durable Power of Attorney ("POA") for the HFT dated May 25, 2007, but effective April 30, 2007. [DE 180-18, pp. 4-5]. With the POA, George signed a promissory note April 27, 2007 with Crestmark Bank for $2,650,000 and committed HFT as a guarantor. [DE 180-18, pp. 2-3, pp. 6-9].

On April 3, 2007, George signed as Trustee of the HFT a Third Amendment to Investment and Loan Agreement with Airlie Opportunity Capital Management, L.P., regarding a loan of $3,606,671.58 to AMI. [DE 180-19]. HFT was the guarantor on the loan. *Id.* at p. 16. On October 29, 2007, George, as President of MW Monroe Plastics, borrowed $2,000,000 from Crestmark Bank and pledged the assets of the HFT to secure the loan. [DE 180-27]. Holmes gave George a Limited Durable Power of Attorney as Trustee of the HFT on November 8, 2007. *Id.*

8

Notably, Holmes had no authority to grant a POA to George after Holmes' resignation as trustee on March 2, 2007. George admitted in his deposition that Holmes was not authorized to grant a POA. [DE 180-6, pp. 115-116]. Holmes likewise admitted that he was not the trustee at that time. [DE 180-10, pp. 257-258]. George failed to tell Crestmark Bank that he had no authority to act on behalf of the HFT. [DE 191-4, pp. 118-122]. The formalities of the HFT were blatantly disregarded while the Limbrights sought to collect under HFT's settlement agreement..

HFT owned a company named Entry Holdings, which had a checking account at First Security Bank. [DE 180-6, p. 147]. From that bank account, George and Kay paid their personal living expenses until approximately 2007 when the CTs began paying these expenses. *Id.* at 147-148.

On December 29, 2006, George proposed to settle his personal obligations with Parkwood Manor, which had resulted in a judgment against him. [DE 180-14; 180-6, pp. 233-234]. The HFT agreed to pay Parkwood $500,000 as part of this settlement and to receive in exchange only the third mortgage on Hofmeister's residence and a lien on George's judgment against Cincinnati Insurance Company. [DE 180-14]. George testified that the HFT had no liquidity to pay the amount, so the obligation was ultimately settled with funds from the CTs. [DE 180-6, p. 233].

On November 30, 2005, an asset listing for the HFT showed the second mortgage on the Hofmeister's house as one of its assets. [DE 180-8]. On April 11, 2001, George and Kay transferred their Florida condo to HFT, yet they continued to use it for their benefit four to five times a year. [DE 180-6, p. 61]. Despite claiming to have transferred AHD to the Children on December 31, 2006, HFT continued to list AHD as one of its assets. [DE 180-16 dated January 26, 2007; DE 180-28 dated December 31, 2007; DE 180-29 dated August 31, 2008].

As in *Comer*, George and Kay Hofmeister treated HFT and the CTs as their own. The trusts were controlled by George and Kay and their family. While there was a separate trustee for the HFT, he was unquestionably influenced in his decisions by George Hofmeister, as evidenced

9

by the granting of POAs to George after Holmes had resigned and his response to George's demand in 2006 that HFT assets be distributed to the Children. Unquestionably, the trusts' funds were used to pay the Hofmeisters' personal expenses and fully supported them in the style of their choosing. Funds were transferred from the trusts for the personal benefit of the Hofmeisters for little or no consideration. *Comer*, 732 F. Supp. at 759. Additionally, there was little separation of trust and individual finances, and trust formalities were dishonored. *Laborers' Pension Fund*, 872 F.2d at 704-05.

The present case also bears similarities to the facts in *Livernois Trust v. Commissioner of Internal Revenue*, 433 F.2d 879 (6th Cir. 1970). Livernois conveyed to his trust "substantially all of his assets, including his stock in five corporations in which he was the sole or principal shareholder." *Id.* at 880. After his death, his son and another person who were the trustees "looked to the Corporations whenever and for whatever purpose it required money. The Corporations paid money to the Trust without collateral and without any express limitation as to the ceiling amount of such payments." Although notes were provided to the corporations, no interest or principal was ever paid. The court concluded: "Essentially the problem here is one of self-dealing between the Trustees of a trust and five corporations which those same Trustees controlled." *Id.* at 882.

The Hofmeisters argue there is no evidence that the trusts were used to commit a fraud or wrong. [DE 189, pp. 16-17]. To the contrary, there is extensive evidence that the trusts were used for lavish personal expenses, including a home valued at $25,000,000 and reduction of the mortgages thereon. The trusts were also used to borrow additional funds and to provide those creditors superior liens against the assets of the Hofmeisters and the trusts. Meanwhile, the Limbrights have been attempting to collect the purchase price for their business since the lawsuit they initiated in March 2001.

The Hofmeisters also argue vigorously that the HFT was created in 1991, nine years before their company, Innovative Coating Technologies, Inc., purchased the Limbrights' company, Performance Plastics, Inc. [DE 189, pp. 17-19]. Accordingly, they claim there could not have been any intent to defraud the Limbrights, whom they had not even met, or to avoid their claims, which did not exist at the time the trusts were formed. The flaw in this rationale is the narrow focus on the debt to the Limbrights.

George and Kay Hofmeister began transferring their assets to the HFT, including AHD which George controlled, soon after the Limbright lawsuit was filed. The Florida condo was transferred to HFT a month later, and the transfer of AHD began two months before the Limbrights obtained their Kentucky judgment in March 2002. AMI, which George also controlled, was created within the HFT in 2004, as were other companies. By using the HFT in this manner, the Hofmeisters protected their assets and their future income from many creditors, not just the Limbrights. For example, George and Kay gave JPMorgan Chase a promissory note February 15, 2001 for $30,000,000, along with mortgages on their residence and farm. Chase obtained a judgment against George, Kay and the farms in April 2005. In 2009, the CTs bought all of Chase's claims for $3,500,000. [DE 180-31]. Other claims against George, Kay and the HFT by Airlie Opportunity Capital Management were purchased by the CTs. [DE 180-33]. George used the HFT in 2006 to settle claims by Parkwood Manor against himself, his family and his childrens' trusts. [DE 180-14]. George was using the assets of the HFT and the assets of the CTs as his personal assets and deriving full benefit from them. Meanwhile, the Hofmeister creditors, including the Limbrights, are unable to collect their judgments.

The Hofmeisters also argue that the HFT merely made distributions to the Children at age eighteen in accordance with the trust terms. That is not true. Megan turned eighteen in March 2003, but she did not receive any distribution from HFT. Scott turned eighteen in October 2004, but he did not receive any distribution from HFT. Jamie turned eighteen in August 2006, but there

11

still was no distribution from HFT. In the Fall of 2006, George called Holmes and asked why Holmes had not made any distributions to the Children. [DE 180-6, p. 34]. The Hofmeisters ask this Court to believe it was mere coincidence that the Limbrights were vigorously litigating their claims against the HFT in Michigan at that same time. On December 14, 2006, the Limbrights and the Hofmeisters mediated a settlement of the claims against HFT. On December 20, 2006, the Florida condo was transferred from HFT to the Children. The condo had been valued on November 30, 2005 at $750,000. [DE 180-8]. On December 31, 2006, AHD, AMI and Guide Point Systems were transferred from HFT to the Children. The December 31, 2006 asset listing for HFT had a total fair market value of $54,905,000. [DE 180-15]. The companies transferred to the Children constituted **84 percent** of that total value. The terms of the HFT provided that when a "child attains age eighteen (18), he shall receive one-third (1/3) of the principal of his trust estate." [DE 180-9, p. 5]. Eighty-four percent is nowhere close to one-third of the trust estate. The formal requirements of the HFT were again blatantly disregarded. Interestingly, the Hofmeisters and HFT did not sign a Settlement Agreement with the Limbrights until January 9, 2007, at which point HFT had no future income.

Defendants claim that the companies transferred were heavily encumbered and not worth the value stated on the asset listing. Holmes said they were worthless and "under the water." [DE 181-12, pp. 204-5]. Several questions arise from that assertion. First, why would you burden your children, who were in school, with liabilities? Second, why would you repeatedly prepare statements showing the Fair Market Value (FMV) of trust assets as being in the tens of millions of dollars? Third, giving the Children assets with a negative value would not comport with the trust requirements of distribution of one-third. None of this makes any sense.

It is the Opinion of this Court that the trusts were merely the alter egos of George and Kay Hofmeister and that the trusts were used to avoid payment to judgment creditors, such as the Limbrights.

B.     **Fraudulent Transfers**

This Court previously determined that Michigan law applied to the Limbrights' claims against George and Kay Hofmeister and the HFT because the action was transferred from Michigan. [DE 46, p. 6]. M.C.L. 566.34(1) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor." M.C.L. 566.34(2) provides:

> In determining actual intent under subsection (1)(a), consideration may be given, among other factors, to whether 1 or more of the following occurred:
>
> (a) The transfer or obligation was to an insider.
> (b) The debtor retained possession or control of the property transferred after the transfer.
> (c) The transfer or obligation was disclosed or concealed.
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
> (e) The transfer was of substantially all of the debtor's assets.
> (f) The debtor absconded.
> (g) The debtor removed or concealed assets.
> (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
> (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
> (j) The transfer occurred shortly before or shortly after a substantial debt was incurred.
> (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Such factors are referred to as "badges of fraud." *Farrell v. Paulus*, 309 Mich. 441, 15 N.W.2d 700, 704 (1944).

In *Farrell,* John Paulus and his wife were involved in a bowling alley partnership with another couple. After Farrell filed suit against John for non-payment of a debt and a trial date was approaching, John obtained a short adjournment. Immediately thereafter, John quit-claimed his interest in the partnership to his wife. All four original parties to the partnership promptly executed bills of sale of the partnership assets to a new corporation and issued one-fourth of the stock to each of the three remaining partners, with the fourth share going to John's son. *Id.* at 702-03. The

13

son paid no consideration for the stock. Without question, John was insolvent after these transactions. *Id.* at 703. Soon thereafter, Farrell was awarded $5,300 against John by a jury. *Id.*

At the time of the transfers, John and his attorneys had knowledge of Farrell's lawsuit. "The status of creditor is determined as of the date when plaintiff's cause of action arose, not the date when judgment was obtained or entered." *Id.* The court held:

> We are convinced by the record that John Paulus transferred his interest in the partnership to his wife and "to the said partnership" with intent to hinder, delay and defraud plaintiff herein of his lawful demand and damages arising out of his suit against Paulus for recovery of his investment in the brewery company. The time and circumstances of the transfer lead directly to this conclusion.
>
> Every assignment of an interest in goods or things in action made with the intent to hinder, delay or defraud creditors is void as against such creditors.

*Id.* Because "Paulus became insolvent as a consequence of the transfers, it is a fair inference that this transfer was without a fair consideration, in which event the actual intent of the transferor has no importance." *Id.* at 704. The court continued:

> As a general rule, transactions between members of a family must be closely scrutinized when the rights of creditors are involved and when such transactions are accompanied by other badges of fraud, a full explanation of the conveyance is required when it is challenged by an unsatisfied creditor.

*Id. See also Kelley v. Thomas Solvent Company*, 722 F. Supp. 1492, 1499 (W.D. Mich. 1989).

In the present case, the transfers from the Hofmeisters to the HFT were without consideration. The transfers were between family members – the Hofmeisters and a trust for the benefit of their children. George Hofmeister retained control of the condo and AHD after the transfer. Shortly before the transfers were made, the Hofmeisters had been sued by the Limbrights.

Likewise, the 2006 transfers from the HFT to the Children, including the Florida condo, the 51 percent interest in AHD, and the 100 percent interest in AMI Manchester were without consideration. The transfer was to the Hofmeisters' children, but George Hofmeister remained in control of the assets. The transfer was of substantially all of HFT's assets (84 percent). The

Condo was valued by HFT at $750,000 on November 30, 2005. [DE 180–8]. HFT's valuation of the three companies on December 31, 2006 totals $46,200,000 and its valuation of all assets was $54,905,000. [DE 180-15]. None of the assets remaining in HFT after the transfers was income producing, and HFT was insolvent thereafter. The transfers occurred shortly after mediation with the Limbrights and shortly before execution of the settlement agreement between HFT and the Limbrights.

Similarly, the transfers of these same assets from the Children to the CTs were without consideration. Additionally, the Hofmeisters remained in control of the assets after the transfer and used the assets for their personal benefit and the benefit of the Children.

All of these transfers exhibit badges of fraud. Accordingly, the Court holds that all of these transfers were made with actual intent to hinder, delay or defraud the Limbrights under M.C.L. 566.34 and should be set aside. M.C.L. 566.34; *Kelley*, 722 F. Supp. at 1499. As a result, judgment in favor of the Limbrights will also be entered against all Defendants in this action, including the Children and the CTs.

### C. Proceedings Supplementary to Judgment

When supplementary proceedings are brought by a judgment creditor, M.C.L. § 600.6131 provides:

> (1) The complainant shall make a prima facie case by introducing in evidence the judgment against the principal defendant and proof of the conveyance complained of. The burden of proof is then on the judgment debtor, the person claiming through him, or the person whom it is claimed holds the property in trust for him, to show that the transaction is in all respects bona fide or that the person is not holding as trustee of the judgment debtor.
>
> (3) Where it appears that the judgment debtor at a time within 1 year prior to the date of the commencement of the action in which the judgment is entered has had title to or has paid the purchase price of any real or personal property to which at the time of the examination his wife, or a relative or a person on confidential terms with the judgment debtor may claim title or right to possession, the burden of proof shall be upon the judgment debtor, or person claiming title or right of possession, to establish that the transfer or gift from him was not made for the purpose of delaying, hindering, and defrauding creditors.

As discussed above, the Plaintiffs met their burden of showing that the transfers from the Hofmeisters to the HFT, to the Children, to the CTs were with actual intent to defraud creditors. The Defendants, on the other hand, failed to meet their burden of establishing that the transactions were bona fide. The primary argument by the Hofmeisters and HFT was that the distributions from HFT to the Children were in accordance with the terms of the trust, which was established before the debt to the Limbrights arose. To the contrary, the terms of the trust were disregarded. Megan received no distribution when she turned eighteen in 2003. Scott received no distribution when he turned eighteen in 2004. Jamie received no distribution when she turned eighteen in August 2006. Even if some delay in distributing assets until Jamie reached eighteen might be adequately explained, nothing explains distributing 84 percent of the trust estate when the trust terms specified a distribution of only one-third. The timing of the transfers is also far too close to be merely coincidental. The Limbrights sue the Hofmeisters on March 6, 2001, and the condo was transferred to HFT on April 11, 2001. Beginning in January of 2002, arrangements were being made to transfer AHD to HFT. Then, on December 14, 2006, the Limbrights and Hofmeisters mediated the Michigan action. On December 20, 2006, the condo was transferred to the Children. On December 31, 2006, AHD, AMI and Guide Point Systems were transferred to the Children. On January 9, 2007, HFT, which was now insolvent, agreed to pay the settlement amount to the Limbrights. However, HFT paid nothing and the assets of the CTs were used to make the first payment to the Limbrights. Nothing was paid thereafter. The CTs' assets remained within the control of George Hofmeister and were used for his benefit.

The transfer of assets from the Hofmeisters to HFT, and the transfers of assets from HFT to the Children and then to the CTs were fraudulent as to the judgment of the Limbrights. These assets are subject to the direct enforcement of the Limbrights' claims under Michigan law. Moreover, the Limbrights' judgment has been registered in Kentucky, and Kentucky law is available for its enforcement. *Condaire, Inc. v. Allied Piping, Inc.*, 286 F.3dd 353, 358 (6th Cir. 2002) ("The

advantages of more favorable execution procedures in another jurisdiction may be available to a plaintiff under 28 U.S.C. § 1963...."); *Euro-American Coal Trading, Inc. v. James Taylor Mining, Inc.*, 431 F. Supp.2d 705, 708 (E. D. Ky. 2006) ("The effect of the registration under 28 U.S.C. § 1963 is the equivalent of an entirely new judgment obtained by filing an independent action on the original judgment.").

### D. Plaintiffs' Claim of Entitlement to Both Judgments

Plaintiffs argue that the Kentucky Judgment and the Michigan Judgment are distinct, and that they should be able to collect both. Judge Lawson's words in his opinion transferring this case to Kentucky are revealing. "This lawsuit represents the latest attempt by the plaintiffs to collect a $1,200,000 judgment originally obtained against defendants George and Kay Hofmeister in the United States District Court for the Eastern district of Kentucky in 2002, plus a second judgment entered in this Court for $1,000,000 in supplementary proceedings to collect the first one." [DE 27, pp. 1-2]. Plaintiffs' 2004 complaint in Michigan sought a judgment "in the full unpaid amount of the judgment"[3] or a lien on sufficient assets "in order to pay the Kentucky judgment."  [DE 189, Ex. I]. The Second Amended Complaint in this case states that the Michigan lawsuit alleged that the Hofmeister Family Trusts "were liable to the Judgment Plaintiffs for the Kentucky Judgment...." [DE 157, ¶ 11].  The settlement agreement, which the HFT breached, stated that payments made under that agreement would be credited to the 2002 Kentucky Judgment.  [DE 181, Ex. 13, ¶ 4.3(a)]. Plaintiffs credited the $300,000 payment against the 2002 Kentucky Judgment in a motion for execution in this Court.  [DE 189-11, p. 3].

Defendants correctly argue that the Michigan Judgment simply allows collection of the Kentucky Judgment from the HFT, a different defendant.  It does not authorize Plaintiffs to collect the judgment amount twice.  *Grace v. Grace*, 253 Mich. App. 357, 368, 655 N.W.2d 595 (2002) ("Generally, under Michigan law, only one recovery is allowed for an injury.").

---

[3] The only "judgment" at that time was the Kentucky Judgment.

### E. Plaintiffs' Claim for Attorney Fees and Exemplary Damages

Plaintiffs argue they are entitled to attorney fees spend on collection of the judgment. "Except for fee-shifting statutes which provide that a trial court may assess an attorney's fee for one party against the other, ... the obligation to pay one's own attorney falls upon the person employing the attorney rather than upon the opposing litigant." *Louisville Label, Inc. v. Hildesheim*, 843 S.W.2d 321, 326 (Ky. 1992). The Michigan authorities on which Plaintiffs rely do not support their claim.

Plaintiffs also argue they are entitled to exemplary damages. This Court previously ruled that punitive damages are not available. [DE 149, p. 3].

### F. Remedies

Defendants stated they are prepared to pay the entire amount owed on the Kentucky Judgment, but have not done so because of Plaintiffs' claim of entitlement to both judgments. [DE 189, p. 34]. If the full amount of the Kentucky Judgment, plus all accrued interest, is paid to the Limbrights by wired funds before the close of business on Wednesday, November 16, no further action by this Court will be necessary. If the judgment is not paid, the parties shall appear before Judge Wier at 9:00 a.m. on Thursday, November 17, for a hearing regarding other remedies, including potential injunctive relief and the appointment of a receiver.

## III. CONCLUSION

**IT IS ORDERED** that:

   A. Plaintiffs' motion for summary judgment [DE 180] is **GRANTED IN PART**, but is **DENIED IN PART** with respect to Plaintiffs' claims for double recovery, fees, and punitive damages.

   B. Defendants' motion for summary judgment [DE 181] is **GRANTED IN PART** with respect to Plaintiffs' claims for double recovery, fees, and punitive damages; all other aspects of Defendants' motion are **DENIED**.

C. A Judgment in favor of Plaintiffs and against all Defendants will be entered contemporaneously with this Opinion and Order.

D. Defendants' request for oral argument [DE 189] is **DENIED** as moot.

E. Defendants' motion regarding attendance at the November 17, 2011, pretrial conference (DE 221) is **DENIED** as moot.

This November 14, 2011.

Signed By:
*Karl S. Forester* KSF
United States Senior Judge