UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 5:09-cv-107-KSF

JAMES H. LIMBRIGHT, et al.                                              PLAINTIFFS

vs.                              **OPINION AND ORDER**

GEORGE HOFMEISTER, et al.                                              DEFENDANTS

This matter is before the Court on Supplementary Defendants' motion [DE 230] to alter, amend, reconsider, vacate and set aside the Court's November 14, 2011 Opinion, Order and Judgment. For the reasons discussed below, the motion will be denied.

**I.      BACKGROUND**

On November 14, 2011, this Court granted partial summary judgment in favor of Plaintiffs. It entered Judgment in favor of Plaintiffs and against all Defendants "in the sum equal to the balance due and owing to the Plaintiffs on their Kentucky Judgment, plus all accrued interest at the legal rate," and their costs. The detailed factual background in this case is set forth in that Opinion and will not be repeated here. Plaintiffs dispute Defendants' calculation of the amount due and the Court's denial of attorney fees, both of which will be addressed by a separate Opinion.

In the present motion, Defendants challenge the Opinion and Order in its entirety on various grounds. Defendants say they are not asking for the money back that they finally paid. [DE 230, p. 2]. Instead, they seek an equitable remedy of setting aside the summary judgment. *Id.*

Defendants first argue that they have been ready and willing to pay the Kentucky Judgment since July 2011, and it was Plaintiffs' insistence on claims without legal support that precluded settlement at an earlier stage of the proceedings. *Id.* at 1. Defendants also argue that Plaintiffs "have no cognizable interest in three young people and their trusts having judgments imposed against them and living with that stigma and all it entails." *Id* at 6. They "submit that a fairer way

to have disposed of the case would have been for a judgment to be entered only in the event defendants did not pay the Kentucky judgment on or before the date the Court specified in the opinion and order." *Id.* They claim they "simply sought the right to pay the money with confidence knowing that they were buying peace." *Id.*

Defendants contend the Court did not consider that the Michigan supplementary to judgment statute, MCL § 600.6101, et seq., only applies to transfers after judgment is entered. They argue that judgment in the Michigan action was entered in May 2008 and that the transfers occurred prior thereto. *Id.* at 7-8. Accordingly, they argue that any judgment based on this statute is erroneous. They further contend that the Michigan court adjudicated the claims of fraudulent transfer such that the claims are *res judicata* and could not be litigated again in Kentucky after the 2008 Michigan judgment. *Id.* at 8-10. Accordingly, they insist that any judgment based on fraudulent transfers is erroneous.

Additionally, Defendants argue vigorously that the Court's ruling regarding fraudulent transfers was also erroneous because: (1) fraudulent intent is a question of fact and not one of law; and (2) summary judgment is inappropriate when intent is at issue. *Id.* at 3. Moreover, Defendants note that fraudulent transfers must be proven by clear and convincing evidence. Accordingly, they contend that summary judgment was improperly granted. *Id.* at 10-18.

With respect to the Court's analysis of the alter ego claims, Defendants argue that any abuse of the various trusts was not the proximate cause of any loss suffered by Plaintiffs. They contend that the Hofmeisters' use of Childrens Trust funds for their personal expenses did not deprive Plaintiffs of funds. Defendants also argue that such expenditures create a jury question as to whether the expenditures were in the best interests of the Children. Likewise, they contend that the payment of Hofmeister personal loans with funds from the Childrens Trust caused no harm to Plaintiffs. They reiterate that several fraud issues and the transfer of the condo were litigated in Michigan and cannot be litigated again here. Finally, they argue that it was "palpable error" for

the Court to state that Mr. Holmes as trustee was "unquestionably influenced in his decisions by George Hofmeister," since Mr. Holmes denied such influence. *Id.* at 18-27. Plaintiffs' responses to these arguments are discussed in part below.

## II.     ANALYSIS

### A.     Standards for Post-Judgment Motions

A motion to alter or amend the judgment under Rule 59(e) "may be granted to correct a clear error of law; to account for newly discovered evidence or an intervening change in the controlling law; or to otherwise prevent manifest injustice." *Westerfield v. United States*, 366 F. App'x 614, 619 (6th Cir. 2010), citing *GenCorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999). It is not "an opportunity to re-argue a case," nor should it be used "to raise arguments which could, and should have been made before judgment issued." *Wilson v. United States Air Force,* 2011 WL 887730 at *1 (E.D. Ky. March 14, 2011). In the present case, Defendants appear to be claiming clear error of law and prevention of manifest injustice.

Federal Rule of Civil Procedure 60(b) permits relief from a final judgment for: "(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence ...; (3) fraud ..., misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged ..., or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." Fed. R. Civ. P. 60(b). A court's discretionary power is "circumscribed by public policy favoring finality of judgments and termination of litigation." "[C]ourts must apply Rule 60(b)(6) relief only in unusual and extreme situations where principles of equity mandate relief.'" *Blue Diamond Coal Co. v. Trustees of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001). Defendants argue here that the judgment has been satisfied, and it is no longer equitable for it to have prospective application.

3

B. **Defendants' Request for Equitable Relief**

Plaintiffs respond that the offer to pay the Kentucky Judgment was not made until after nearly ten years of litigation including an appeal of the Michigan Judgment, which was entered pursuant to a breached settlement agreement. Moreover, it was not until after summary judgment was entered by this Court and Defendants were ordered to make payment immediately that any payment was actually made. [DE 239, pp. 2-3]. In other words, the Defendants' actions speak so loudly that it is very difficult to hear what they are saying.

Plaintiffs also question Defendants' representation to the Court that they were able to make payment at an earlier date. Defendants repeatedly told Plaintiffs that "the ability to pay was tenuous" and that financing would disappear. *Id.* at 3-4.

In response to Defendants' claim that the Hofmeister Children should not have to "live with the stigma of a judgment on their credit report the rest of their lives," Plaintiffs state that "the Hofmeisters and the other Defendants lost the right to make that argument when they placed the Hofmeister Children directly in the middle of all of the fraudulent transfers and transactions. The Hofmeisters have no one to blame but themselves." *Id.* at 4. Plaintiffs note that such a judgment was demanded from the outset and was foreseeable.

With respect to Defendants' argument that "fairer" outcome would have been to withhold entry of judgment unless Defendants failed to make payment to Plaintiffs, the Court observes that no authority whatsoever is cited in support of this creative suggestion. No doubt, that is because established law is to the contrary. Article III courts are "to decide actual controversies by a judgment which can be carried into effect." *Wheeler v. City of Lansing*, 60 F.3d 931, 940 (6th Cir. 2011). The Court also notes that two judgments have already been entered against most of the Defendants, all to no avail. The Court agrees that there is no basis for affording equitable relief to Defendants.

### C. Fraudulent Transfers

Defendants claim that, under Michigan law, fraudulent intent is a question of fact which the Court should not have decided by summary judgment. What Defendants ignore are two prior rulings in this case that proof of actual intent is not always required in fraudulent transfer cases. *Limbright v. Hofmeister*, 688 F. Supp. 2d 679, 684 (E.D. Ky. 2010) ("While one type of fraudulent transfer does involve 'actual intent to hinder, delay or defraud any creditor of the debtor,' that is not the only type."); *Limbright v. Hofmeister*, 2009 WL 915803 at *7 (E.D. Mich. 2009) ("intent to defraud is sometimes not an element of a fraudulent transaction claim."); M.C.L. § 566.34(1)(b).

Defendants also ignore authority holding that actual intent may be determined by circumstantial evidence and consideration of a number of statutory factors. M.C.L. § 566.34(2). Among the factors applicable here are: (a) the transfer was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer was concealed; (d) before the transfer was made, the debtor had been sued; (e) the transfer was of substantially all of the debtor's assets; (h) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred; (I) the debtor was insolvent or became insolvent shortly after the transfer was made; and (j) the transfer occurred shortly before or shortly after a substantial debt was incurred. *Id.* "In evaluating the legitimacy of property transfers, Michigan courts may look to 'badges of fraud' in determining whether intent to defraud exists." *William L. Comer Family Equity Trust v. United States*, 732 F. Supp. 755, 759 (E.D. Mich. 1990). *See also Sumpter v. United States*, 302 F. Supp. 2d 707, 723 (E.D. Mich. 2004) ("[C]ourts generally rely on the traditional 'badges of fraud' to establish fraudulent intent.").

The court's decision in *Foodland Distributors v. Al-Naimi*, 220 Mich. App. 453, 559 N.W.2d 379 (1996), is illustrative. Amir Al-Naimi lived a lavish lifestyle with a 15,000 square foot home, expensive cars and a fifty-eight-foot yacht. *Id.* at 464. His grocery business, New Metro, was heavily indebted to Michigan National Bank ("MNB"), and MNB was about to foreclose on Amir's

5

home.  *Id.* at 458, 464, 468.  Amir negotiated a restructuring of his personal debt to MNB through an agreement whereby New Metro took on $400,000 of additional debt for no consideration and Amir's personal debt was reduced.  *Id.* at 483-84. The trial court held there was insufficient evidence of fraud to support a claim of fraudulent conveyance.  The appellate court disagreed and found fraud as a matter of law.  It held that Amir's conveying a debt to New Metro, without any attendant benefit to New Metro, was a fraudulent conveyance.  *Id.* at 477, 481.  The court said that "[f]raud may be proved with 'facts which are inconsistent with an honest purpose.'"  *Id.* at 459.  Here, it held that the facts "lead[] to but one conclusion: fraud."  *Id.  See also, Comer*, 732 F. Supp. at 760.

A few of the facts in the present case illustrate the similarity between *Foodland* and the Court's conclusion in this case.  George Hofmeister's company, Innovative Coating Technologies, Inc. ("ICT"), purchased the Limbrights' company, Performance Plastics, Inc., in 2000.  ICT promptly filed bankruptcy and did not make the payments due.  On March 6, 2001, the Limbrights sued George and Kay on their guarantee of the purchase price.  Less than a month later, George and Kay transferred their Florida condo to the Hofmeister Family Trust ("HFT").  Beginning in January 2002, George transferred his 51 percent ownership of AHD, the company he operated, to the HFT.  The Limbrights' judgment against George and Kay was entered March 29, 2002.  In April 2004, American Metals Industries was created within the HFT to acquire and hold other companies, and the separate Childrens Trusts ("CTs") were created.  The Limbrights sued the HFT in Michigan in 2004.  In April 2005, Chase Bank received a judgment against George and Kay and their horse farm for approximately $35 million.  The horse farm is where their 35,000 square foot residence is located.  In November 2005, the HFT listed a second mortgage on the residence as an asset and showed the fair market value of AHD stock at $50 million.

On December 14, 2006, the Limbrights and Defendants George, Kay and the HFT, mediated the Michigan case and reached an agreement for payment to the Limbrights, but the agreement was not effective until the documents were completed. [DE 180-3].  Around this time,

6

George claims he read the trust agreement and called Doug Holmes, the Trustee of the HFT, to ask why distributions of one-third of the trust had not been made to the children when they turned eighteen as the trust document required. By this time, Megan was twenty-one, Scott was twenty, and Jamie had been eighteen for several months. On December 20, 2006, the Florida Condo was transferred from the HFT to the Children. On December 29, 2006, George and the HFT settled claims by Parkwood Manor for $500,000 and transferred the third mortgage on the residence to the HFT.[1] On December 31, 2006, Holmes distributed to the Children the 51 percent ownership in AHD, the ownership in AMI (MW Universal) and Guide Point Systems.

The asset listings by the HFT on December 31, 2006, showed the total of all assets, before the transfers, was $54,905,000.[2] The asset value of the three companies transferred was listed as $46,200,000, or 84 percent of the total. However, George testified that "the three companies had big negative net worths" and Holmes "was worried as a Trustee to hold those, so he distributed those." [DE 180-6, pp. 34-36]. George testified that the HFT "really had no available income since the distribution," that AHD was subject to a big lawsuit with a resultant jury verdict of almost $2 million, and that any cash generated by MW Universal and AMI Manchester was being used to pay secured creditors. [DE 188-10, p. 153; 180-6, pp. 36-39]. The Children placed the distributed assets, except the condo, in their own trusts ("CTs").

Not until January 9, 2007, was the Settlement Agreement with the Limbrights executed and effective. [DE 180-4]. The HFT agreed to pay the Limbrights $950,000 in installments during 2007 for the Kentucky Judgment. The assets Holmes left in the HFT were the Paris building and the horse farm, "the passive assets." [DE 180-6, p. 39]. As noted above, the horse farm and residence had a $35 million judgment against them. George testified that the HFT had no available income

---

[1] George testified that the HFT had no ability to pay the settlement, so it was ultimately paid from funds of the Childrens Trusts.

[2] The asset valuations provided by the HFT did not list any liabilities.

or cash with which to make the payments. [DE 188-10, pp. 153, 164-166]. Because the HFT could not make the payments on the settlement, George arranged for the CTs to make the initial payments. HFT defaulted on the final payment of $650,000, and judgment against the Hofmeisters and the HFT was entered by the Michigan court on May 6, 2008.

Condensing this time line, the Limbrights file suit in March 2001, and the Hofmeisters immediately start placing assets – condo and AHD – in their irrevocable trust, HFT. The Limbrights are granted judgment in 2002 and begin collection efforts. New businesses operated by George are created in the HFT. In 2004, the Limbrights file suit against the HFT in Michigan. On December 14, 2006, mediation results in an agreement for HFT to pay $950,000 to the Limbrights. Six days later, the HFT transfers the condo to the Children. Eleven days after that, the HFT transfers its business assets to the Children, leaving HFT with only heavily encumbered real estate. It was the first distribution to the Children, despite the fact that distributions were well past due, and it did not comply with the trust terms to distribute one-third. Only after these assets were conveyed, did the HFT execute documents to effectuate the agreement to pay the Limbrights. George admits the HFT was unable to make any payments to the Limbrights when due, so he used funds from the companies that had now been conveyed to the CTs to make the initial payments for HFT.

After the companies were conveyed to the Children, they were immediately conveyed to the CTs. Thereafter, George and Kay used cash generated by the CTs' companies to pay their personal living expenses and travel. As of February 15, 2011, George had directed more than $1,655,000 in payments from the CTs' companies to bank accounts used by George and Kay for personal living expenses. [DE 180-22, pp. 23-24, 41-43]. George also borrowed substantial funds while guaranteeing the loans with assets from the CTs and/or HFT. In April 2007, George borrowed $2,650,000 from Crestmark Bank. In October of that year, George arranged a $2 million line of credit from Crestmark. In December 2008, Crestmark made a loan of $700,000 to George. All were guaranteed by the trusts.

8

The Defendants contend they demonstrated a genuine issue of material fact by asserting that all these events were purely coincidental and that they had no intention to place assets beyond the reach of creditors, such as the Limbrights. "Fraud may be proved with 'facts which are inconsistent with an honest purpose.'" *Foodland*, 559 N.W.2d at 382. The badges of fraud here are compelling.

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' It follows from these settled principles that if the factual context renders respondents' claim implausible – if the claim is one that simply makes no economic sense – respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Electric Industrial Co., :Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Hofmeisters' defensive claims that the various irrevocable trusts were established solely to benefit the Children and that distributions were made as required by the trusts "simply makes no economic sense" and is refuted by the record. Distributions were not made in a timely fashion. The distributions did not come close to the required one-third of the trust under any evidence. Moreover, what economic sense is there in an asset distribution to benefit the Children if the assets are companies "with big negative net worths"? Having distributed these companies to the Children, what economic benefit do the Children derive from George and Kay paying all of their personal expenses from cash generated by the CTs and encumbering the CTs further with more debt? The only motive for which these transfers make economic sense is to place these assets out of the reach of creditors

The Defendants contend that the HFT was never insolvent. They say "[u]nder Michigan law, '[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.' Mich. Comp. Laws § 566.31(1)." [DE 230, p. 14]. The Court has reviewed the cited statute carefully and has been unable to find any definition of insolvency therein. While subsection (1) of MCL § 566.32 does have that definition, subsection (2) says: "A debtor who is generally not

9

paying his or her debts as they become due is presumed to be insolvent." Black's Law Dictionary also defines "insolvency" as "the inability to pay debts as they mature." Black's Law Dictionary (Pocket Ed. 1996). George testified that, after the transfers, the HFT was unable to make any of the payments to the Limbrights when they became due. Rather than rebut the presumption of insolvency, his testimony reaffirmed it.

The Defendants also argue that the issue of fraudulent transfer was raised in the Michigan case and, therefore, is *res judicata* in this case. In support, they cite *Union Guardian Trust Co. v. Rood*, 308 Mich. 168, 13 N.W.2d 248 (1944), for the proposition that a cause of action is merged into a judgment and can never again form the basis of a suit between the same parties. What Defendants do not consider is that there "are three prerequisites to the application of the doctrine of res judicata: 'a prior decision on the merits; the issues must have been resolved in the first case ...' and both actions must be between the same parties or their privies." *Baraga County v. State Tax Com'n*, 466 Mich. 264, 645 N.W.2d 13, 16 (2002). The judgment in the Michigan case did not involve a decision on the merits. Judgment was entered as a result of a settlement agreement and a subsequent breach of that settlement agreement. The Michigan court never decided the merits of the Limbrights' fraudulent transfer claims. Accordingly, Defendants' argument fails under the first element.

### D. Alter Ego Determinations

Defendants contend the Court's alter ego analysis is fatally flawed because there is no evidence of any loss to Plaintiffs that was caused by various alleged abuses of the trusts. [DE 230, pp. 18-27]. Defendants state, for example, that "[t]he children's trusts did not give the Hofmeisters anything." *Id.* at 19. Defendants seem to have forgotten that George directed more than $1,655,000 in cash from the CTs' companies to bank accounts used by George and Kay for personal living expenses. If those funds had been directed to the Limbrights instead, this litigation would have been over long ago.

Assets from the CTs were also used to buy out claims from the Hofmeisters' personal creditors. For example, $3,500,000 in funds from the CTs purchased an April 5, 2005 judgment against George, Kay and Highland Farms and several mortgages on their residence. The Limbrights judgment was entered three years earlier in 2002. Nonetheless, the Limbrights gave priority to the later judgment. Similarly, George used $4,500,000 in CTs' funds to purchase various obligations from Airlie Opportunity Capital Management, including a $4,000,000 loan entered into in April 2004 and a $3,000,000 loan in July 2004. These loans, subsequent to the Limbrights' judgment, were given priority when payments were made. George, as Trustee of the CTs, used the trust assets as his own and paid only $300,000 to the Limbrights, despite a settlement agreement promising $650,000 more.

Defendants argue that the Limbrights "did not have access to the children's trust money, so if the money remained in the possession of the children's trusts, plaintiffs would not have been any closer to satisfying their judgment." *Id.* at 21. They would have had access to the Hofmeisters' assets had they not been transferred into the HFT after the first Kentucky litigation began. They also would have had access to the HFT assets, had they not been transferred out to the Children within days after a settlement agreement was reached with the Limbrights. They would have had their obligation paid if the Hofmeisters had not borrowed new funds and used CTs' assets to pay those loans.

As the Court described in its November 14, 2011 Opinion, there are many similarities between the present case and *Comer Family Equity Trust v. United States*, 732 F. Supp. 755 (E.D. Mich. 1990), in which the court held that a family trust was the alter ego of the individuals. *Limbright v. Hofmeister*, 2011 WL 5523713 at *3 (E.D. Ky. Nov. 14, 2011). There, and here, the individuals treated the trust assets as their own; trust funds were used to pay the individuals' personal expenses; the transfers to the trusts was for no consideration; the trust fully supported

the individuals in the style of their choosing; and the father signed trust documents when he had no authority to do so. *Id.*

Defendants' arguments that the use of Equity Holdings funds to pay personal expenses, the use of the condo, and the transfers to HFT were subsumed in the Michigan judgment are wholly without merit as discussed above. There was no decision on the merits in Michigan, and there is no *res judicata* effect here.

### III. CONCLUSION

**IT IS ORDERED** that Supplementary Defendants' motion to alter, amend, reconsider, vacate and set aside [DE 230] the Court's November 14, 2011 Opinion, Order and Judgment is **DENIED**.

This February 28, 2012.

Signed By:
*Karl S. Forester* KSF
United States Senior Judge